IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

CHARLES SUMMERS,

                    Plaintiff,

v.                                    CIVIL ACTION NO.   2:22-cv-00148

WEST VIRGINIA DEPARTMENT
OF HOMELAND SECURITY, et al.,

                    Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant D.A. Lester's Motion for Partial Summary Judgment* (Document 84), the *Memorandum in Support of Defendant D.A. Lester's Motion for Partial Summary Judgment* (Document 85), *Plaintiff's Motion for Partial Summary Judgment* (Document 88), the *Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment* (Document 89), *Defendant D. A. Lester's Response to Plaintiff's Motion for Partial Summary Judgment* (Document 99), *Plaintiff's Joint Response in Opposition to the Motions for Partial Summary Judgment Filed by The Defendants* (Document 101)[1], and *Defendant D.A. Lester's Reply in Support of Motion for Partial Summary Judgment* (Document 104), as well as all attached exhibits.  For the reasons stated herein, the Court finds that the Plaintiff's motion should be denied, and that Deputy Lester's motion should be granted.

---

[1] Inasmuch as the claims between the Plaintiff and the West Virginia Department of Homeland Security, the West Virginia State Police, and Trooper Lindsey have been resolved through settlement, the Court addresses only the remaining claims against Deputy Lester.

**FACTS**

The Plaintiff, Charlotte Summers, initiated this action with a *Complaint* (Document 1) filed on March 27, 2022.   She named the West Virginia Department of Homeland Security (WVDHS), the West Virginia State Police (WVSP), and Trooper R. Lindsey of the West Virginia State Police as Defendants.   Ms. Summers subsequently moved to amend to add parties, correct allegations in the wake of discovery, and make typographical corrections.   The Court granted her motion, and she filed her *First Amended Complaint* (Document 13).   In addition to the original three Defendants, Ms. Summers named the Summers County Commission, the Summers County Sheriff's Department, and D.A. Lester.   The Court granted a motion to dismiss the Summers County Commission and the Summers County Sheriff's Department.   Mr. Lester also moved to dismiss, asserting a statute of limitations defense, which the Court denied.   Mr. Lester reasserted the statute of limitations defense in a subsequent motion for summary judgment, which the Court also denied.   Ms. Summers died during the pendency of the litigation, and the Court entered an order on February 16, 2023, substituting Charles Summers, her son and representative of her estate, as Plaintiff.   On December 17, 2023, the Court was advised that a settlement had been reached as to the claims against WVDHS, WVSP and Trooper Lindsey.

The relevant remaining claims are as follows: Count I – Unreasonable Search and Seizure in Violation of the Fourth Amendment of the U.S. Constitution Pursuant to 42 U.S.C. § 1983, as to Deputy Lester; Count II – Use of Excessive Force in Violation of the Fourth Amendment of the U.S. Constitution Pursuant to 42 U.S.C. §1983, as to Deputy Lester; Count IV – Battery, as to Deputy Lester.

Trooper Lindsey came to Ms. Summers' property on March 31, 2020, to arrest her son, David Summers, pursuant to an arrest warrant.   He had secured Mr. Summers in his cruiser and began driving away when Ms. Summers cursed at him and ordered him off of her property. Trooper Lindsey contended she threw a metal object that appeared to be a piece of an aluminum door frame in the direction of his cruiser, while Ms. Summers and David Summers deny that she threw an object.   Ms. Summers was 75 years old and frail.   Trooper Lindsey got out of the vehicle, followed her into her home and tased her in the back.   She fell to the floor, suffering a broken nose and abrasions to her arms and legs.   Trooper Lindsey continued to tase her while she was on the ground and handcuffed her.   Deputy Lester arrived on the scene after Ms. Summers had been restrained, at which time Trooper Lindsey requested his assistance in transporting Ms. Summers from the floor to a police cruiser.   David Summers contends Trooper Lindsey and Deputy Lester then dragged Ms. Summers across concrete and gravel from her home to Deputy Lester's cruiser.   Ms. Summers' injuries later became infected, eventually requiring amputation of one leg.   She died on January 7, 2023.

In a sworn statement, David Summers described the events of March 31, 2020.   Trooper Lindsey arrived to arrest him and declined to allow him to speak to his mother before taking him to his police cruiser and beginning to drive away.   He heard his mother come out and ask what was going on, and Trooper Lindsey ordered her back into the house.   She refused and again asked what was going on, and Trooper Lindsey got out of his vehicle and walked back toward the house, following Ms. Summers.   David Summers could no longer see them, but he heard the screen door open, then heard a pop or pow sound that he believes was the taser.   Trooper Lindsey called for an ambulance, and the Sheriff and two other officers pulled in.   David Summers observed them

3

"dragging my mom through the concrete pad, the carport, of course, and all through the gravel, all the way to the vehicle," to put her in the sheriff's deputy's car.  (David Summers Statement at 14:16–18) (Document 88-5.)   He said that his mother appeared to be unconscious or semi-conscious.   David Summers stated that he believed it was "Lindsey and Farmer, maybe, Deputy Farmer, or the other young guy that was there.  I can't remember exactly which one."  (*Id.* at 15:8–11.)   That is consistent with his deposition testimony, in which he described observing Trooper Linsey and a sheriff's deputy dragging his mother out of the house and to the cruiser.

Deputy Lester testified that he responded to either a radio call from Trooper Lindsey requesting assistance or a dispatch call directing him to assist Trooper Lindsey at Ms. Summers' residence.   He arrived at the residence after Trooper Lindsey had tased Ms. Summers and assisted Trooper Lindsey in helping Ms. Summers stand up and walk to a vehicle by placing a hand under her right armpit and a hand in her hand.   He indicated that she was not in handcuffs at the time, and she walked with the assistance of both officers.   He stated that he did not recall seeing any injuries, blood, or abrasions on her face or legs, and he denied dragging her to the cruiser.

Trooper Lindsey described the incident in a police report.   His report notes that "Deputy Lester and Tpr. Lindsey escorted Ms. Summers to Deputy Lester's patrol car."   (Lindsey Rep. at 1) (Document 88-3.)   The report further notes that a deputy called EMS, and Trooper Ellison accompanied Ms. Summers to the hospital, but provides no description of her injuries or how she incurred those injuries.   Photographs of Ms. Summers in the hospital reveal a cut across her nose, blood on her face, and bloody abrasions on her arm and legs.

## APPLICABLE LAW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at

*3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility.   *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).   If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate.   *Anderson*, 477 U.S. at 250.   If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."   *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review.   *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd*, 474 F. App'x 101 (4th Cir. 2012).   Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion.   *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## QUALIFIED IMMUNITY

Deputy Lester asserts, in part, that he is entitled to qualified immunity. Qualified immunity is an affirmative defense intended to shield public officials from civil suits arising out of their performance of job-related duties. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Defendants asserting a qualified immunity defense first bear the burden of "demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (internal quotation marks omitted.) The defense of qualified immunity is available unless the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal emphases omitted). Officials are protected even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right. *Pearson*, 555 U.S. at 231–32. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (internal quotation marks and citations omitted).

The reasonableness analysis is objective. Courts must "examine[] only the actions at issue and measure[] them against what a reasonable police officer would do under the circumstances," but the inquiry "must be filtered through the lens of the officer's perceptions at the time of the incident." *Rowland v. Perry*, 41 F.3d 167, 172–73 (4th Cir. 1994). "[T]he officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are." *Id.* at 173.

**DISCUSSION**

The Plaintiff seeks summary judgment as to Counts I, II and IV, arguing that no genuine disputes of material fact remain as to his claims for unreasonable search and seizure, excessive force, and battery as to Deputy Lester, and that he is thus entitled to judgment as a matter of law. Deputy Lester argues he is entitled to summary judgment only as to the Plaintiff's claim for unreasonable search and seizure.

### A.   Count I – Unreasonable Search and Seizure

Deputy Lester argues he is entitled to summary judgment as to Count I for two reasons. First, he contends the constitutional tort claim of unlawful search and seizure is personal to the affected party and thus Ms. Summers' claim that he unlawfully entered her home to assist Trooper Lindsey in transporting her to the cruiser does not survive her death.   In the alternative, he claims he is protected by qualified immunity as an officer who arrived at the scene as backup.   While he notes that there remains a factual dispute as to whether he entered Ms. Summers' home, he emphasizes that he did not arrive at the home until she had already been tased and placed under arrest, and he could not observe the events which may or may not have given rise to exigent circumstances to enter the home or probable cause to arrest.   Accordingly, he argues that he was permitted to rely on Trooper Lindsey's representations absent knowledge of clear, contradictory facts to suggest his actions were unlawful.

The Plaintiff counters that Ms. Summers' claims do survive her death and that Deputy Lester is not entitled to qualified immunity.   He argues that the West Virginia Supreme Court of Appeals has characterized all Section 1983 actions as personal injury actions expressly protected by West Virginia's survival statute.   He further maintains that the evidence supports a finding that

8

Deputy Lester unlawfully entered Ms. Summers' home but provides no further factual support in opposition to qualified immunity beyond characterizing Deputy Lester's argument as a "see no evil, hear no evil, speak no evil" defense.   (Pl.'s Joint Resp. at 19) (Document 101.)

           1.      Survivability of the Unlawful Entry Claim

As an initial matter, the Court finds that Deputy Lester effectively waived his right to challenge the survivability of Ms. Summers' Section 1983 unlawful entry claim by failing to respond in opposition to the Plaintiff's earlier motion to substitute himself for his mother upon her death.

Federal law does not address "the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant."   *Moor v. County of Alameda*, 411 U.S. 693, 702 n.14 (1973).   When federal law is thus "deficient," courts must turn to "the common law, as modified and changed by the constitution and statutes of the [forum] State," as long as these are "not inconsistent with the Constitution and laws of the United States." *See Robertson v. Wegmann*, 436 U.S. 584, 585 n.1 (1978) (quoting 42 U.S.C. § 1988).   Accordingly, West Virginia's survivability statute provides the "principal reference point" in determining the survival of Ms. Summers' civil rights action.   *See id.* at 590.   West Virginia Code Section 55-7-8a(a) provides in pertinent part that, "[i]n addition to the causes of action which survive at common law, causes of action for injuries to property, real or personal, or injuries to the person and not resulting in death, or for deceit or fraud, also shall survive."   The statute further affirms that "[i]f any such action is [timely] begun during the lifetime of the injured party," and that party dies while the action is pending, the action may be prosecuted to judgment and execution by the decedent's personal representative. W. Va. Code § 55-7-8a(b).

Ms. Summers died on January 7, 2023.   On January 29, 2023, Charles Summers moved to substitute himself as Plaintiff in this matter as Ms. Summers' personal representative and Administrator of her Estate.   (*See* Mot. by Personal Rep. Charlotte Summers to Sub. Party) (Document 40.)   Therein, the Plaintiff characterized this matter as a "personal injury action" which survives Ms. Summers' death.   Importantly, Deputy Lester never responded in opposition to the motion.   Accordingly, the Court, noting that the motion was unopposed and discerning "no evident reason to proceed otherwise," found it appropriate to substitute Charles Summers as the Plaintiff.   (Order Granting Mot. to Sub. Party) (Document 45.)   Deputy Lester now argues, nearly nine months later and after completing discovery on the claim, that Ms. Summers' unlawful entry claim did not survive her death because it is not sufficiently analogous to a survivable personal injury action under West Virginia law.   The Court finds that, regardless of whether Ms. Summers' claim survived her death, the time to raise such argument was at the time of the previous motion to substitute.   Thus, the Court proceeds to the summary judgment analysis on this claim.

### 2.    Unlawful Entry

The Fourth Amendment protects people, and their "houses, papers, and effects" against "unreasonable searches or seizures."   U.S. Const. amend. IV. "As that text makes clear, 'the ultimate touchstone of the Fourth Amendment is 'reasonableness.''"   *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).   Intrusions into private residences are subject to scrutiny, and "searches and seizures inside a home without a warrant are presumptively unreasonable."   *Payton v. New York*, 445 U.S. 573, 586 (1980).   The Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."   *Id.* at 576.   However, "the warrant

requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

"One important exception is for exigent circumstances." *Lange*, 141 S.Ct. at 2017. The exception is "case specific," requiring courts to examine the circumstances to determine "whether a now or never situation actually exists" to justify a warrantless search. *Id.* at 2018. The Supreme Court has established that "hot pursuit" can be a type of exigent circumstance justifying warrantless entry into a residence. *See United States v. Santana*, 427 U.S. 38, 42–43 (1976); *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). The seriousness of the crime at issue must also be considered. The Supreme Court has held that:

> The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency. On many occasions, the officer will have good reason to enter—to prevent imminent harms of violence, destruction of evidence, or escape from the home. But when the officer has time to get a warrant, he must do so—even though the misdemeanant fled.

*Lange v. California*, 141 S. Ct. 2011, 2024 (2021); *see also United States v. Anderson*, 688 F.3d 339, 344 (8th Cir. 2012) (explaining that *Welsh* established two factors to consider "in determining whether 'hot pursuit' creates an exigency: (1) the gravity of the underlying offense, and (2) whether the government can demonstrate an 'immediate or continuous' pursuit of the suspect from the scene of the crime").

Ultimately, the Court does not need to decide whether the facts created an exigency permitting Deputy Lester to enter Ms. Summers' home pursuant to the Fourth Amendment. Under the doctrine of qualified immunity, an officer is not liable for his actions, even if those actions would have violated the Constitution, if no clearly established law prohibited those actions.

*See Pearson*, 555 U.S. at 236.   The parties dispute whether Deputy Lester crossed the threshold of Ms. Summers' home when he assisted Trooper Lindsey in lifting Ms. Summers from the floor of her home.   (*Compare* Lester Dep. at 1512–16:7 *with* John Farmer Dep. at 34:16–35:1 (Document 101-13).)   Nevertheless, it is undisputed that Deputy Lester arrived at the scene after the altercation between Trooper Lindsey and Ms. Summers had concluded, Ms. Summers had been tased and placed under arrest, and Trooper Lindsey had entered her home.   Further, no evidence has been offered to rebut Deputy Lester's testimony that Lindsey requested his assistance in getting Ms. Summers off the ground, and that Ms. Summers appeared to also request his help:

> Q: You heard Deputy Farmer testify that you and Trooper Lindsey had started helping her up when he turned around to go call EMS. Did you hear that?
> A: Yes, sir.
> Q: Do you agree with that?
> A: Yes, sir.
> Q: He said that you were right inside the doorway of her home helping her up. Do you agree with that?
> A: As in inside the residence, or just in the doorway of the residence?
> Q: He said inside the doorway is what he said.
> A: My body itself was not inside the residence. At that time, Lindsey had leaned out and grabbed her arm and started to help her up because she was cussing me, telling her to get her up off of that cold ground. I do recall her telling me that. And Lindsey asked me to assist him. So, at that time, I reached and grabbed her hand that she leaned up and gave to me and helped pull her up and then assisted her to the vehicle.

(Lester Dep. at 15:12–16:7) (Document 101-10.)   The Plaintiff presents no evidence or case law suggesting that Deputy Lester knew, or reasonably should have known, that his actions under these circumstances would violate Ms. Summers' Fourth Amendment rights.   Indeed, the Court identifies no clearly established law which would have provided notice to a reasonable officer that similar conduct was prohibited.   *See Cooper*, 735 F.3d at 158.   Notably, Deputy Lester testified

12

that he asked Lindsey to explain what happened and Lindsey advised that Ms. Summers had assaulted him. (*See* Lester Dep. at 26:2–9). Police officers routinely rely on information from other officers, and courts have found that such reliance—absent clear, contradictory evidence—is reasonable. *See, e.g.*, *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid" have established probable cause.); *United States v. Hensley*, 469 U.S. 221, 231 (1985) (citing *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976) ("[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.")); *Lucas v. Shively*, 31 F. Supp. 3d 800, 813 (W.D. Va. 2014), *aff'd*, 596 F. App'x 236 (4th Cir. 2015) ("Indeed, a police force could not function without reasonable reliance on the statements and efforts of others." (internal citations omitted)). Viewing each motion in the light most favorable to the non-moving party, the undisputed facts establish that a reasonable officer in Deputy Lester's position would not have believed he acted unlawfully or in violation of Ms. Summers' constitutional rights. Accordingly, the Court finds that Deputy Lester is entitled to qualified immunity as to Count I and summary judgment is appropriate.

### B. Count II – Excessive Force

The Plaintiff moves for summary judgment on the excessive force claim against Deputy Lester, arguing that he is liable for the use of excessive force because he assisted Trooper Lindsey in dragging Ms. Summers across concrete to transport her from her home to a police cruiser, ultimately resulting in the infection and amputation of her leg. Deputy Lester maintains that the evidence presents a clear factual dispute which hinges on witness credibility, and thus genuine

13

issues of material fact remain which preclude summary judgment. Notably, he does not assert qualified immunity as to this claim.

The Fourth Amendment provides a right to be free from unreasonable seizures, including the use of excessive force. *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). "In the context of an ongoing police encounter . . . we focus on the moment that the force is employed." *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 668 (4th Cir. 2020), *as amended* (June 10, 2020) (internal quotation marks omitted). Factors to consider in excessive force cases include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Although Deputy Lester testified that he could not recall whether Ms. Summers had visible injuries during their interaction, it is undisputed that Ms. Summers did sustain injuries at some point during the encounter with Trooper Lindsay and Deputy Lester. (*See* Summers County ARH Emergency Dept. Note) (Document 101-14) (noting "superficial skin abrasions" from being "dragged across concrete"); (WVSP Evidentiary Photo) (Document 101-15) (depicting Ms. Summers lying in the backseat of a police cruiser, eyes closed, with blood on her nose and cheek); (Prehospital Care Report) (Document 101-16) (noting 3cm laceration to her nose, skin tear to left lower leg, leg pain, nose pain); (WVSP Hospital Photos) (Document 101-17.) However, the parties have each submitted conflicting testimony [2] as to how she sustained these injuries,

---

[2] The Plaintiff also submitted the Sworn Statement of Charlotte Summers, taken before her death. (*See generally* Charlotte Summers Sworn Statement) (Document 88-4.) Inasmuch as Ms. Summers was never subject to cross-

specifically regarding whether Ms. Summers was dragged from her home to the police cruiser after

she was tased.   Deputy Lester testified that Ms. Summers walked to the cruiser with assistance:

> Q: Did she walk to the cruiser on her own?
> A: Yes, sir. She was having issues walking, so it was a very slow
> walk, but, yes, she did walk to the car with our assistance of keeping
> her upright.

(Lester Dep. at 17:5–8.)   Trooper Lindsey's testimony largely supports Deputy Lester's account,

although the Plaintiff disputes the credibility of such testimony:

> Q: Okay. You used the word "escort," I believe, in your criminal
> complaint. Tell me, in this case, what did "escort" mean?
> A: We assisted Ms. Summers up and we took her out of the
> residence to [Lester's] patrol car.
> Q: Did you carry her out?
> A: I don't recall.
> Q: Did you drag her out?
> A: No.
> Q: Again, in your response to my written discovery, you said that
> you grabbed one armpit, Deputy Lester grabbed the other, and you
> carried her with her feet off the floor off the ground, all the way to
> Deputy Lester's patrol car. Do you recall that?
> A: I don't recall that. That's probably been a year ago.
> Q: Well, did that happen or did that not happen?
> A: I had one armpit and Deputy Lester had the other. I don't recall
> if she was walking or if her feet were off the ground at that time.

(Lindsey Dep. at 52:7–53:4.)   David Summers' testimony paints a markedly different picture:

> Q: […] What was the next thing you saw of your mother? When did
> you see her next?
> A: They were dragging her out -- dragging her out from underneath
> my carport.
> Q: So was she moving under her own power at all?
> A: No. She was being drug, legs dangling behind her, one sheriff
> over here, Lindsey on the other side, had her hand up under her arm
> and the other one like this and they was dragging an 80-pound
> woman.

---

examination on her account of the incident and her statement has not been offered as that of an opposing party, the
Court finds that her sworn statement is inadmissible hearsay and thus excludes it from consideration in the summary
judgment analysis pursuant to *Federal Rule of Evidence* 801.

[…]
Q: Was -- Could you tell whether she was conscious or not?
A: She was out of it, blood dripping off of her face and everything.
[…]
A: She was unconscious all the way up until I left. She was still unconscious when they put her in the ambulance and left.
[…]
Q: And you kind of described to an extent the placement of her hands?
A: One on her wrist and one up underneath her arm. Both of [the officers] had her like that, dragging her. Her legs were dragging on the ground.

(David Summers Dep. at 31:19–32:3, 32:13–16, 33:5–7, 34:23–35:3.) Considering the conflicting evidence, the Court finds that a genuine dispute of material fact remains as to whether Ms. Summers' injuries were the result of being dragged, thus precluding summary judgment on this issue.

### C.    Battery

The Plaintiff further moves for summary judgment as to the battery claim arising out of the dragging. Deputy Lester maintains that the competing accounts of the incident preclude summary judgment. In West Virginia, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *W. Virginia Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 495 (W. Va. 2004). Inasmuch as the battery claim arises out of the same disputed facts underlying the excessive force claim, the Court finds that summary judgment is precluded as to Count IV.

**CONCLUSION**

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant D.A. Lester's Motion for Partial Summary Judgment* (Document 84) be **GRANTED** to the extent he asserts qualified immunity as to Count I, and that the *Plaintiff's Motion for Partial Summary Judgment* (Document 88) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:      December 21, 2023

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

17